## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

GRACE AKINLEMIBOLA,

     Plaintiff,

v.

RAHM EMANUEL, MICHAEL
RENDINA, GINGER OSTRO,
CHLOE RASMAS, ANNA
VALENCIA, SEAN RAPELYEA,
CITY OF CHICAGO, ANDREW
MASON, CHICAGO PUBLIC
SCHOOLS, REGUS LLC, SALLIE
FULWILER, SPIKE LEE,
MICHAEL PFLEGER, and
CHICAGO POLICE DEPARTMENT,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**17CV3174**

Case No.

RECEIVED SDNY PRO SE OFFICE 2017 APR 28 PM 1:17 S.D. OF N.Y.

## COMPLAINT

**NOW COMES** Plaintiff, GRACE AKINLEMIBOLA ("Plaintiff"), by and through herself as a Pro Se litigant, complaining against Defendants RAHM EMANUEL, MICHAEL RENDINA, GINGER OSTRO, CHLOE RASMAS, ANNA VALENCIA, SEAN RAPELYEA, ANDREW MASON, CHICAGO PUBLIC SCHOOLS, CITY OF CHICAGO, CHICAGO POLICE DEPARTMENT, REGUS PLC, SALLIE FULWILER, SPIKE LEE, and MICHAEL PFLEGER (collectively, the "Defendants"), files this Complaint. Plaintiff now respectfully brings this cause of action before this Court.

## PRELIMINARY STATEMENT

1. Plaintiff, GRACE AKINLEMIBOLA, files this lawsuit as one of the Anti-Corruption Cases, where each lawsuit surrounds corrupt acts within the United States of America, the state of Illinois, state agencies, state actors, municipal actors, or other institutions impacting these same agencies and actors.

2. This lawsuit herein pertains to the acts directly initiated by Defendants. Plaintiff, as a consequence of Defendants' fraudulent acts, has been deprived of her constitutional rights.

3. Plaintiff is an attorney in the state of Illinois.

4. After a marked point in time, Plaintiff was treated as a second-class citizen by Defendants while working in the Office of Mayor Rahm Emanuel, where Defendants MICHAEL RENDINA, ANNA VALENCIA, and SEAN RAPELYEA provided others with the perception that Plaintiff was not deserving of a professional reputation and began to fraudulently malign Plaintiff's reputation to other parties. They created a fraudulent culture within the Mayor's Office in their efforts to ruin Plaintiff's reputation, where anyone who did not conform to this culture would be penalized.

5. Plaintiff seeks remedies for the consequences derived from Defendants' corrupt acts. Plaintiff, a prior employee at CHICAGO PUBLIC SCHOOLS in 2012 in the Office of Budget and Grants Management as a Budget Analyst, discovered fraudulent activity in 2015 regarding the 2012 closing of the 50 Chicago Public Schools while she was an employee of Mayor Rahm Emanuel as an Assistant to the Mayor. GINGER OSTRO, Budget Director of Chicago Public Schools in 2012 and Chief Financial Officer of Chicago Public Schools in 2015, fraudulently manipulated Plaintiff's 2012 budget recommendations to be used as empirical justification for the closing of Chicago Public Schools when Plaintiff's budget recommendations never consisted of closing public schools. Not only was Plaintiff's work product manipulated, but MICHAEL RENDINA intended to frame Plaintiff for the closing of Chicago Public Schools and RAHM EMANUEL attempted to fraudulently conceal the news

from the media, where Plaintiff discovered that the *Chicago Tribune* was about to release a story and alerted colleagues in the Mayor's Office.

6. Plaintiff was treated as a second-class citizen for not engaging in fraudulent activity while working in the Office of Mayor Rahm Emanuel. When Plaintiff always provided alternative solutions to accomplish the goal, Plaintiff was met with resistance.

7. These acts damaged Plaintiff's reputation within the community, as vividly noted in the ridicule Plaintiff faced from community leaders and influential filmmakers such as MICHAEL PFLEGER and SPIKE LEE and found within SPIKE LEE's 2015 film, *Chi-Raq*. Plaintiff also faced fraudulent acts from within the office space she had rented for Plaintiff's business at 203 N. LaSalle Street. Plaintiff has since relocated her company's headquarters to New York City, New York and has also moved to New York.

8. While many may search to find their esteem in life, their purpose for being in a world that may choose to color their outcomes, Plaintiff was meant to be a leader. Her leadership ability started as a member of the Math & Science magnet in high school, where she rose to the top ten percent of her class to become a member of the National Honor Society, a member of the Chess Team and Brain Game team, the captain of her tennis team, and the founder of a debate club, where she was able to get accepted into Stanford University's Junior Statesmen of America summer program but was unable to attend because Plaintiff did not have enough money to pay for the tuition.

9. She maintained and even broadened her leadership ability in college: as President of her residence hall, she organized a television show mimicking the TLC network show *Trading Spaces* with dorm residents; as a two-term President of the National Association of Black Accountants and with the help of a stellar team, she organized, fundraised, negotiated the contract, and drafted the contract for a guest lecture by Kwame Jackson, the runner-up from the first season of *The Apprentice*; and as President of three different organizations at the same time, she pledged to be a member of her sorority of Delta Sigma Theta Sorority, Inc., where she became Publicity Chair and organized and managed the week-long semester initiatives.

10. Even while in law school when Plaintiff was suffering from disparate treatment (as noted in a lawsuit filed simultaneously in this Court, *Grace Akinlemibola v. Chicago-Kent College of Law & Carolyn Shapiro*), Plaintiff became the Co-Founder for a Film Series on Race & the Law and was elected the Chair of the Midwest Black Law Students Association, where she organized a Midwest Lobby Day with leaders from the state of Indiana who later hailed her efforts in a concurrent resolution, HCR 26; implemented a first-of-its-kind community service standard across all 52 student chapters in the Midwest; organized a first-of-its-kind regional convention that gained first-ever corporate sponsors in the Indiana Pacers and Eli Lilly & Co.; safeguarded Illinois voting rights; and solicited, negotiated, and managed the contract with Phaedra Parks from the *Real Housewives of Atlanta* as the guest speaker.

11. And while working for Mayor Rahm Emanuel, an individual who Plaintiff admired from his post as Chief of Staff to President Barack Obama, Plaintiff was hopeful for an opportunity for leadership in public service. Instead, Plaintiff found fraudulent activity coupled with an antagonism for Plaintiff's beliefs. Her glass slipper had shattered.

12. Plaintiff started a private business in February of 2016 to create a new avenue of prosperity for herself, where her business made over $3 million dollars in its first fiscal year of only ten and a half months and is worth slightly over $1 billion dollars. Plaintiff amassed her first fiscal year of income based on gaining consulting contracts with many entrepreneurs and solving new ways to fix some of their problems and negotiating cumulative management strategies. Her businesses are worth a total of over $1 billion dollars, where Plaintiff owns over 40 different brands and products.

13. Because of all of the Defendants' fraudulent acts, Plaintiff has suffered deep emotional injuries, reciprocity with individuals and elected officials in the City of Chicago, denigration of her esteem as a public servant, and economic damages and opportunity costs. Plaintiff has also been deprived of her constitutional right to liberty as secured by the Thirteenth Amendment and the Fourteenth Amendment of the United States of America. As for Plaintiff's

Fourteenth Amendment right to liberty, this right may apply to municipalities such as Defendant CITY OF CHICAGO where the inflicted injury is an execution of a government "custom." *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

14. Plaintiff seeks compensatory relief in the form of compensatory and punitive damages.

15. Plaintiff accordingly brings this action to not only protect herself and her self-worth, but to also seek justice.


## **PARTIES**

16. Plaintiff, GRACE AKINLEMIBOLA, is an individual residing and domiciled in New York City, New York.

17. Defendant RAHM EMANUEL is an individual residing and domiciled in Chicago, Illinois. He currently serves as the Mayor of Chicago, Illinois.

18. Defendant MICHAEL RENDINA is an individual residing and domiciled in Chicago, Illinois.

19. Defendant GINGER OSTRO is an individual residing and domiciled in Chicago, Illinois.

20. Defendant ANNA VALENCIA is an individual residing and domiciled in Chicago, Illinois.

21. Defendant SEAN RAPELYEA is an individual residing and domiciled in Chicago, Illinois.

22. Defendant CHLOE RASMAS is an individual residing and domiciled in Chicago, Illinois.

23. Defendant ANDREW MASON is an individual residing and domiciled in Chicago, Illinois.

24. Defendant CITY OF CHICAGO is a municipal corporation in Chicago, Illinois.

25. Defendant CHICAGO PUBLIC SCHOOLS is the City of Chicago school district in Chicago, Illinois.

26. Defendant CHICAGO POLICE DEPARTMENT is an administrative body in Chicago, Illinois.

27. Defendant SPIKE LEE is an individual residing and domiciled in New York City, New York.

28. Defendant MICHAEL PFLEGER is an individual residing and domiciled in Chicago, Illinois.

29. Defendant SALLIE FULWILER is an individual residing and domiciled in Chicago, Illinois.

30. Defendant REGUS PLC is a foreign corporation with headquarters located in Luxemburg City, Luxemburg and incorporated in St. Helier, Jersey in the United Kingdom. REGUS PLC has locations in 900 cities worldwide, including locations and business within New York City.

## JURISDICTION AND VENUE

31. Plaintiff brings this action as a violation of rights secured by the Constitution of the United States of America pursuant to 42 U.S.C. §1983. Any state law claims will have jurisdiction in federal court through supplemental jurisdiction. 28 U.S.C. §1367.

32. Plaintiff is a resident of New York City and now domiciled in New York City as she has recently relocated to the state of New York, but the acts and conduct in this lawsuit all occurred in the state of Illinois. The heart of New York's choice of law analysis focuses on the jurisdiction which has "the greatest concern with the specific issue raised in the litigation." *Babcock v. Jackson*, 12 N.Y.2d 473 (1943). Any conflicts between the two jurisdictions are resolved by the outside jurisdiction's "conduct-regulating" rules. *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189 (1985).

33. This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331.

34. Venue is proper in the Northern District of Illinois under 28 U.S.C. §1391(b)(1) as all defendants reside in the northern judicial district of Illinois; however, venue is not *equitable* in any court within the state of Illinois. Because the Anti-Corruption cases deal primarily with government actors, legal institutions, and government parties who are intertwined in various respects with all of these same parties, any judge within the state of Illinois would be unable to truly reciprocate and preside over the matters within these lawsuits fairly and equitably in a manner that would not be a disservice to the public interest.

## FACTUAL BACKGROUND

35. Plaintiff, GRACE AKINLEMIBOLA, seeks justice against Defendants for the Defendants' corrupt acts.

36. On January 13, 2017, Plaintiff filed the Anti-Corruption Lawsuits against various public officials, public entities, and certain private institutions.

### FRAUDULENT CLOSING OF CHICAGO PUBLIC SCHOOLS

37. In 2012, Plaintiff worked in the budget office of CHICAGO PUBLIC SCHOOLS as a Budget Analyst. Plaintiff left in August of 2012 after multiple discussions of being paid less than white male colleagues who were doing the same work as Plaintiff.

38. Plaintiff attended law school on a full-time basis beginning in August of 2012.

39. Defendant GINGER OSTRO was the Budget Director for Chicago Public Schools in 2012. GINGER OSTRO later became the Chief Financial Officer for Chicago Public Schools.

40. Plaintiff was a Budget Analyst, where Plaintiff managed the budgets for the Curriculum & Instruction departments which included the Department of Magnet, Gifted & Talented; the Office of Language & Cultural Education; the Department of Assessments; the Department of Arts; Department of Instructional Tools & Technology; the Department of Literacy; the Department of Math & Science; and the Pathways conglomerate that included separate departments.

41. There were initially two Budget Analysts and three Grants Analysts on the Education team, where the Budget Analysts would manage the budgets and the Grants Analysts would manage the CPS grants. All of the Budget Analysts on the Education team were assigned departments that included central department oversight such as the Curriculum & Instruction departments and the Department of Special Education. A third Budget Analyst joined the Education team prior to Plaintiff leaving Chicago Public Schools, where Plaintiff then relieved the Pathways conglomerate onto the new analyst and

trained him on how to prepare the Pathways budgets as Plaintiff had found intricacies and issues with the technology that – if not recognized when creating the budgets – can endanger more than one department. Plaintiff discussed this issue with both Dana Brink and GINGER OSTRO, who simply attempted to account for the issue by using a conglomerate approach that did not reconcile with department-level allocations and would have skewed expectations and decision-making if someone who did not know what the budgets consisted of and how to create the budgets. As CHICAGO PUBLIC SCHOOLS suffered from high turnover of employees outside of the budget office, many of the department directors would not have had the historical knowledge to inform a Budget Analyst of prior expenditures and rationale for prior allocations.

42. The Budget Manager for the Education team, Dana Brink, dealt more with the high-level questions as would impact the Education departments as a whole than specific department budget management.

43. In January of 2012, Plaintiff had started a master's degree program at Northwestern University for her Masters in Public Policy & Administration in the evenings while she was working at Chicago Public Schools.

44. In June of 2012, after Plaintiff had realized she was paid lower than her white male counterparts on the Education team and after Plaintiff provided evidence of outperforming expectations, Plaintiff met with both Dana Brink and GINGER OSTRO to discuss the disparate treatment where her pay was less than her white male counterpart. Plaintiff found the disparate treatment disturbing especially where Plaintiff had negotiated with GINGER OSTRO prior to beginning her role at Chicago Public Schools and Plaintiff had rejected Defendant's initial pay offer of $52,000 and counteroffered for $60,000. GINGER OSTRO then cited a public crisis and lack of funds to compensate Plaintiff any more than $56,000. Plaintiff had then accepted without knowledge that there were white males in the same role who were paid more than Plaintiff at the $60,000 Plaintiff had originally requested.

45. When Plaintiff had met with Ginger in June of 2012, GINGER OSTRO was unable to provide an explanation for why her white male counterpart – who

had started at approximately the same time as Plaintiff – was paid more than her.

46. As Plaintiff had noticed other decision-making from GINGER OSTRO that provided a conclusion of racial bias without the humility to fix an issue once brought to her attention, Plaintiff became disgruntled. As Plaintiff had already been accepted to law school at Chicago-Kent College of Law, Plaintiff decided in June of 2012 to attend law school and leave Chicago Public Schools by the time classes would begin in August of 2012.

47. Plaintiff had then spoken with the Chief Instruction Officer, Jennifer Cheatham, regarding potential opportunities in the Curriculum & Instruction departments as Plaintiff had intended to leave the budget office. Plaintiff had initially received a positive response; however, as the Chief Instruction Office had meetings with GINGER OSTRO regarding budget cuts, Plaintiff was informed that they would not be able to open new budget positions.

48. In August of 2012 and prior to the announcing of the closing of CPS schools, Plaintiff left Chicago Public Schools to attend law school.

49. Not long after Plaintiff left, Plaintiff discovered that GINGER OSTRO had promoted Plaintiff's white male counterpart to a Senior Budget Analyst.

50. Plaintiff did not discover until 2015 that a requested document that she had created for the then-Budget Director of Chicago Public Schools ("CPS"), Defendant GINGER OSTRO, while she was an employee at Chicago Public Schools was used as a "data" rationale for the closing of Chicago Public Schools. After Plaintiff announced she was leaving CPS, she provided notice to other budget office internal staff members and Directors of the departments whose budgets she managed so as to provide and set up an adequate training period for those who will take over her departments.

51. When Plaintiff left, she used the remainder of her vacation time to be used after she physically left CPS and informed everyone of Plaintiff's last *physical* day at CPS, which was almost immediately prior to the beginning of fall classes at Chicago-Kent College of Law in 2012. On Plaintiff's last physical day at CPS, Defendant GINGER OSTRO approached Plaintiff for Plaintiff to "find $100 million in the budget" within one hour for a deadline GINGER OSTRO

had to meet. GINGER OSTRO spoke with Plaintiff briefly about a few budget items that GINGER OSTRO seemed to dislike and not want to keep, including the Chief Instruction Office and the entire central department of Math & Science. As Plaintiff had managed the budgets for the Curriculum & Instruction departments and the Pathways departments prior to leaving, Plaintiff created an analysis that only looked at those departments, including any school-based positions that she was aware. The analysis made concessions by closing certain school-based *positions*, and not actual schools, along with a few other changes to provide an amount as GINGER OSTRO had requested but would deviate from GINGER OSTRO's seeming intention to remove the Chief Instruction Office and the central education departments.

52. After Plaintiff had provided GINGER OSTRO with the final recommendations, Plaintiff realized her recommendations may be intentionally misconstrued to the departments of the budgets she had managed as a management cut derived by Plaintiff without any of the Curriculum & Instruction and Pathways Directors knowing the time constraints or the "hunt" for a large amount of funds that needed to come from their departments. As Plaintiff had strong relationships with many of the department directors, she immediately went to go speak with Jesch Reyes, the then-Director of the Math & Science Department who was also an African-American, since she believed GINGER OSTRO had negative intentions towards keeping Jesch's position or his department as a budgetary constraint. Plaintiff then informed Jesch Reyes of how Plaintiff was told to find at least $100 million from the education departments, making sure he understood that GINGER OSTRO had already seemed to have a mind for cutting his department and thus the cuts Plaintiff had made were offered as a compromise.

53. Plaintiff later discovered that GINGER OSTRO used Plaintiff's analysis, where Plaintiff only noted closing school-based positions and *not actual schools*, as justification for closing schools by using the spreadsheet as empirical evidence for closing schools. Plaintiff discovered that GINGER OSTRO had deceitfully

reframed Plaintiff's recommendations to highlight a recommendation that Plaintiff *never once* reputed or intended to repute in her spreadsheet analysis.

54. In September of 2014, while in law school, Plaintiff began working in the Office of Mayor RAHM EMANUEL, where Plaintiff switched her law school status to become an evening student and worked full-time in the Chicago Mayor's Office.

55. Plaintiff had graduated from law school in May of 2015.

56. In early July of 2015, Plaintiff discovered that Defendant MICHAEL RENDINA, formerly the Director of Legislative Counsel & Government Affairs for Mayor Rahm Emanuel and currently Mayor Rahm Emanuel's Senior Advisor, had discovered the faulty underlying "data" rationale for the closing of the schools after Plaintiff had already started working as an Assistant to the Mayor for Mayor Rahm Emanuel.

57. After finding out, Defendant MICHAEL RENDINA was intending to frame Plaintiff for the fraudulent closing of Chicago Public Schools after making arrangements to ruin Plaintiff's character.

58. Prior to Defendant MICHAEL RENDINA working for Mayor Rahm Emanuel, MICHAEL RENDINA was the Director of Legislative Affairs, a non-education department, at Chicago Public Schools. MICHAEL RENDINA was in his role at Chicago Public Schools while Plaintiff was a Budget Analyst with the education departments at Chicago Public Schools.

59. Plaintiff discovered that Plaintiff's spreadsheet along with a story regarding fraudulent acts at Chicago Public Schools was about to be released in the *Chicago Tribune* that made Plaintiff the source of the school closings at CPS. Plaintiff alerted many Mayor's Office colleagues as to Plaintiff's response and certain facts surrounding the circumstances.

60. In this regard, Plaintiff sent an email to Mayor's Office colleagues requesting for them to inform the public of the school closings and to remove fear by disclosing Plaintiff's name and involvement as Plaintiff was of the mindset that proactiveness would be better in the circumstance.

61. Plaintiff's advice went unheeded.

62. The story that was initially about to be released by the *Chicago Tribune* was ultimately never released.

63. Yet after Plaintiff discovered that the recommendations for the closing of Chicago Public Schools were based on GINGER OSTRO's fraudulent misrepresentations and after the Mayor was informed of the fraudulent closing of Chicago Public Schools, Defendants RAHM EMANUEL and MICHAEL RENDINA enabled and perpetuated the fraudulent act after the discovery with attempts to conceal the fraud from the public.

64. Plaintiff has filed a petition for a criminal indictment against RAHM EMANUEL, GINGER OSTRO, and MICHAEL RENDINA with the State of Illinois State's Attorney's Office.

### FRAUDULENT CULTURE IN RAHM EMANUEL'S OFFICE

65. After the discovery, Plaintiff had started to gain leadership in the Mayor's Office as it related to strategic initiatives.

66. Plaintiff had then began to notice that MICHAEL RENDINA had started to malign Plaintiff's reputation by communicating to others in and outside of the Mayor's Office – either through words or through actions – that Plaintiff was "dumb."

67. Prior to Defendant ANNA VALENCIA starting her tenure in the Mayor's Office in March of 2016, Plaintiff requested a meeting with Defendant MICHAEL RENDINA, who was the Director of Legislative Counsel & Government Affairs at that time, and SEAN RAPELYEA, in approximately October of 2015, to request a pay raise as she was the least paid in the Mayor's Office of Legislative Counsel & Government Affairs (LCGA).

68. Plaintiff first brought forth examples of her work ethic, especially in solving problems in high-profile situations. She also supplemented all of this information with the fact that she had earned a credible reputation – by that time – for her work product.

69. During this meeting, Plaintiff then pointed out that she had many years of professional experience in the accounting and budgeting industries with

highly-visible leadership positions, yet was the least paid staff member on their LCGA teams in their department.

70. During this meeting, Plaintiff stated specifically that she was less concerned with "why" she happened to be paid less than everyone else and was more concerned with fixing the situation without making it a larger issue than what it needed to be.

71. During this meeting, Plaintiff also noted that she graduated from law school and had been maintaining a 4.0 GPA at Northwestern University for her Masters in Public Policy & Administration degree.

72. During this same meeting, MICHAEL RENDINA stated, "We know you do good work." He also stated that he would try to figure out another solution for her.

73. It was after this meeting that Plaintiff started to notice a marked difference in the way MICHAEL RENDINA and SEAN RAPELYEA treated her. MICHAEL RENDINA and SEAN RAPELYEA began to openly favor another team member, Claudia Chavez, who was on the same Government Affairs team that Plaintiff was on at the time.

74. Plaintiff began to notice that MICHAEL RENDINA had started to malign Plaintiff's reputation by communicating to others in and outside of the Mayor's Office – either through words or through actions – that Plaintiff was "dumb."

75. Prior to this time, Plaintiff had already been established as a team member who was able to work more independently.

76. ANNA VALENCIA was later appointed to Director of Legislative Counsel & Government Affairs, as MICHAEL RENDINA had shifted to become Mayor Rahm Emanuel's Senior Advisor.

77. When ANNA VALENCIA began working in the Mayor's Office, Plaintiff showed ANNA VALENCIA everything that Plaintiff was working on at the time.

78. MICHAEL RENDINA communicated to others in and outside of the Mayor's Office that Plaintiff was "dumb" for not conforming to a fraudulent culture.

79. As Plaintiff was an African-American female, MICHAEL RENDINA's communication had a compounding effect, where others began to openly ridicule Plaintiff. Plaintiff knows that if she were a white male, the communication offered by MICHAEL RENDINA, ANNA VALENCIA, and SEAN RAPELYEA would not have had that drastic of an impact where Plaintiff would have been ultimately treated as a second-class citizen and openly ridiculed.

80. In Plaintiff's experience, Plaintiff found that high-level, important items that needed to be clarified without confusion were meant to be written or documented in some way. Plaintiff found that the Chief of Staff, Eileen Mitchell, and ANNA VALENCIA were similar to Plaintiff in this regard, although ANNA VALENCIA still practiced a fraudulent culture in other ways.

81. MICHAEL RENDINA and SEAN RAPELYEA, on the other hand, were of the variety where they would consistently change, lie, conceal anything done that could not be corroborated, or attempt to place another person with the blame they want to avoid. As an example, anyone who did not conform to this culture was ridiculed.

82. In February of 2016, Plaintiff started a private business after finding that MICHAEL RENDINA had started to ruin Plaintiff's reputation in and outside of the Mayor's Office and had been seeking to justify removing Plaintiff from the Mayor's Office and the City of Chicago.

83. Plaintiff publicly disclosed this business on a statement of interest filed with the CITY OF CHICAGO.

84. The business made over $3 million dollars in its first fiscal year of only ten and a half months and is worth slightly over $1 billion dollars. Plaintiff amassed her first fiscal year of income based on gaining consulting contracts with many entrepreneurs and solving new ways to fix some of their problems and negotiating cumulative management strategies. Her businesses are worth a total of over $1 billion dollars, where Plaintiff owns over 40 different brands and products. While Plaintiff was an employee in the Mayor's Office, Plaintiff was not a payroll employee of the business.

85. In March of 2016, MICHAEL RENDINA had been selected by RAHM EMANUEL to move from his role as Director of Legislative Counsel & Government Affairs in the Mayor's Office to his current role of Senior Advisor in the Mayor's Office. Anna Valencia then replaced MICHAEL RENDINA as Director of Legislative Counsel & Government Affairs in the Mayor's Office.

86. ANNA VALENCIA then attempted to manipulate Plaintiff's outcome by lying about Plaintiff's role and lying to other people regarding Plaintiff's role, where Plaintiff had then moved from Mayor's Office of Legislative Counsel & Government Affairs to work with Chief of Staff, Eileen Mitchell.

87. MICHAEL RENDINA created a fraudulent culture, where fraudulent acts and concealment of fraudulent acts became the custom. Others caught on to the fraudulent culture and enabled it to others within the Mayor's Office so as to create more deference for actions that fall within the boundaries of this fraudulent culture.

88. Prior to November 1, 2016 and after she had started her business, Plaintiff was juggling her affiliation as Chief Executive Officer of the business with her former duties as Deputy Director of Strategic Affairs in the Mayor's Office in the City of Chicago. As Deputy Director of Strategic Affairs, Plaintiff worked with the Chief of Staff. After publicly disclosing her business on statements of interest almost immediately after starting the business, her business had later grown to the point that the Chief of Staff in the Mayor's Office, Eileen Mitchell, had claimed to have the business be an issue over seven months later.

89. During approximately three weeks of negotiation, Plaintiff brought ideas for alternative solutions that could remove any underlying issues. Plaintiff actually arranged an alternative solution that was not a violation of any personnel codes for the City of Chicago and Plaintiff articulated to the Chief of Staff why she believed the solution to be one that could work. She was referred to the Chief of Staff as a matter of judgment since Plaintiff worked in the Mayor's Office and would have more stringent rules based on the perception. Plaintiff was forced to make a decision to dissolve her business, sell her business, or resign from the Mayor's Office due to an ethics judgment.

Plaintiff was given until October 31, 2016 to notify the Chief of Staff of her decision. On October 31, 2016, Plaintiff refused to lose the business that she had started with nothing and she refused to resign as she felt her obligations were not complete.

90. Plaintiff was thus terminated from the Mayor's Office on October 31, 2016.

91. After filing the initial Anti-Corruption Lawsuits in January of 2017, Plaintiff was met with further disturbance from the Mayor's Office.

92. Prior to January of 2017 – in October of 2016 – Plaintiff had paid all of her parking tickets. Towards the end of October of 2016, while Plaintiff was still an employee in the Mayor's Office, the Mayor's Office brought to Plaintiff's attention that they had "become aware" of Plaintiff having outstanding parking tickets and that it was a City policy for City employees to not have any outstanding debt with the City of Chicago. It took Plaintiff approximately a week or two weeks to pay off the remaining parking tickets that included four parking tickets accumulated over many months.

93. After filing the Anti-Corruption Lawsuits, Plaintiff began to randomly accumulate parking tickets within less than nine weeks. In the less than nine weeks after filing the lawsuits, Plaintiff had quickly accumulated at least eight different parking tickets, where Plaintiff found herself at times receiving a ticket for going into a building and putting her hazard lights on only to find a ticket on her car within less than ten minutes.

94. On Saturday, February 25, 2017, she parked her car in front of the Deloitte building on the intersection of Monroe St. & Wacker Dr. for an event that she was invited to participate. By the time she had left the event, her car had received a boot by the City of Chicago.

95. Plaintiff parked her car at approximately 9:50 am. Plaintiff received the boot on her car at 10:38 am.

96. In order for an individual to remove a boot from their car, an individual must appear *in person* at a payment processing center during their hours of operation. On Saturdays, the location at 400 W. Superior Street was open from 8 am to 4:30 am, where Plaintiff would only have had a few hours before

the location closed to enter into a hardship plan or pay the tickets. This location is not open on Sundays.

97. According to the policy of the City of Chicago, an individual "must secure the release of the boot within 24 hours." After 24 hours, the City may then tow the vehicle.

98. Once the vehicle is towed, the vehicle then incurs a tow fee and additional charges for the storage of the vehicle every day that the vehicle stays at the relocated location. A vehicle then stays in the auto pound for up to 15 days before an individual can request an extension of an additional 15 days before the vehicle is sold.

99. In recent months, Plaintiff's business has suffered from a lack of cash flows, where Plaintiff has reinvested into the business and has waived her own paychecks since December of 2016. After filing the lawsuits and the circumvention of having the cases heard in the court of law by federal judges, Plaintiff had started to find it more difficult to sign new clients or expand business with current clients, where at least one of her clients where Plaintiff had previous negotiations had expressly brought up the issue of the anti-corruption lawsuits and stated how they did not want to have any impending issue with either Mayor Rahm Emanuel or Governor Bruce Rauner. Plaintiff has thus been unable to maintain utility bills and necessary bills associated with her home, where she took out a small mortgage simply to help her business.

100. Plaintiff was unable to pay the past due amount of the parking tickets and Plaintiff's car was towed the very next day on Sunday, February 26, 2017.

101. On February 27, 2017, Plaintiff was upset and sent an email to Defendant MICHAEL RENDINA and CHLOE RASMAS in the Mayor's Office, where Plaintiff retaliated by promising that Rahm Emanuel and certain Mayor's Office employees will get prosecuted in the court of law for fraudulently taking her vehicle and for the fraudulent concealment of necessary emails Plaintiff had requested in recent FOIA requests. Plaintiff never received a response.

102. Plaintiff asserts that certain Mayor's Office employees were attempting to have Plaintiff get towed so as to provide circumstantial "evidence" that

Plaintiff filed her Anti-Corruption lawsuits with a corresponding In Forma Pauperis in bad faith.

103.    Plaintiff drove a 2016 Lincoln MKZ.


### FOIA Requests from RAhm Emanuel's Office

104.    Plaintiff filed the initial Anti-Corruption Lawsuits on January 13, 2017.

105.    On January 23, 2017, Plaintiff sent Chicago Mayor RAHM EMANUEL's office a list of emails she would like to get from the Mayor's Office in accordance with the Illinois Freedom of Information Act. Exh. A.

106.    In response to Plaintiff's initial request, Defendant CHLOE RASMAS responded to Plaintiff's request by providing that the search terms provided over a specific time frame produced more than 10,000 results.

107.    Plaintiff questioned the results because the keywords would not seem to match her perception of the emails she had sent while in the Mayor's Office, since Plaintiff had requested emails that she herself had written while in the Mayor's Office. Exh. B at 2.

108.    Plaintiff then responded by tailoring her request. Exh. B at 1.

109.    For one of the original requests, listed as item number 3, Plaintiff had asked for "[a]ll sent emails from Grace Akinlemibola of or concerning "Chicago Public Schools" from July 1, 2015 through August 31, 2015 where Grace Akinlemibola asked for a particular written passage be sent to the press." Exh. A.

110.    For items requested from or to "Grace Akinlemibola" as Grace Akinlemibola *is* the Plaintiff, Plaintiff particularly recalls a number of emails that should be provided in the results.

111.    Plaintiff asserts that some of the requests, where the email is from or sent to "Grace Akinlemibola" during the relevant time frames and with the additional search criteria, should provide less than 10,000 emails. Plaintiff further believes the approximate number of emails to be closer to, if not much less than, 100 emails.

112.    As Plaintiff recalls from her time in the Mayor's Office, Plaintiff sent an email to other Mayor's Office staff requesting for certain items regarding the fraudulent closing of Chicago Public Schools be disclosed to the public. Plaintiff recalls this email to have been sent in early July of 2015. RAHM EMANUEL's Chief of Staff and Senior Advisor at that time was Lisa Schrader and David Spielfogel, respectively. Plaintiff recalls that Lisa Schrader may have already informed the Mayor's Office of her impending departure of the Mayor's Office. RAHM EMANUEL's Director of Legislative Counsel & Government Affairs at the time was MICHAEL RENDINA. RAHM EMANUEL's next Chief of Staff, Eileen Mitchell, did not begin in the Mayor's Office until August of 2015. This email was sent to Adam Collins and Kelley Quinn, carbon copied Michael Rendina, and blind carbon copied over twenty other members of the Mayor Office along with at least one elected alderman of the Chicago City Council. As such, this information was not private or personal information as non-Mayoral office members whom were outside of the Mayor's control were included on this email.

113.    Defendant CHLOE RASMAS did not include this email, along with other relevant emails, by citing 5 ILCS 140/7(1)(b) and Section 7(1)(c), where these sections of the Illinois Freedom of Information Act prohibit the disclosure of "private information" and "personal information." Exh. C.

114.    Defendant CHLOE RASMAS in this same response also stated that "because the redacted information does not pertain to the transaction of business of the public body, there is no legitimate public interest in releasing the information." Exh. C. There is no such qualification in the non-disclosure of public information as there is a presumption that *all* records in the possession of a public body are open to inspection or copying, where a public body claiming exemption has the burden to prove "by clear and convincing evidence" that the requested item is exempt. 5 ILCS 140/1.2. *See New York Times Company v. United States of America*, 403 U.S. 713 (1971) (The United States Supreme Court established the right to publish government documents as long as the publication did not damage "the nation or its people.").

115.    In her response on February 21, 2017, Defendant CHLOE RASMAS also
included a fraudulently altered response, where she included an email that
was forwarded to Plaintiff including an attachment where Mayor's Office
interns had drafted summaries of each alderman. The email was dated July
30, 2015 and included the attached profiles for each alderman. For the 4th
Ward, a picture of the current 4th ward Alderman Sophia King, was provided
instead of Ald. Will Burns, the alderman at that time -- either by July 30, 2015
or before that date – that would have been the only picture to have been
associated with the 4th Ward Alderman by that particular date. Prior to that
point, Plaintiff herself along with Claudia Chavez had prepared prior one-
pagers – that were designed differently and presented particular
information—for certain aldermen. Alderman Will Burns served as alderman
of the 4th ward from May of 2011 through February of 2016. He resigned from
his post in early February of 2016, announcing his resignation in January of
2016. Exh. E.

116.    On February 15, 2017, Plaintiff also sent a Freedom of Information Act
("FOIA") request to Chicago Public Schools. Exh. D at 1.

117.    The Chicago Public Schools FOIA Officer, ANDREW MASON, attempted
to prohibit the free access of information by requiring further narrowing of
search items.

118.    The particular email from which Plaintiff sent an analysis that was later
fraudulently used by Chicago Public Schools to close 50 schools in 2012 did
not have a subject line from Plaintiff's recollection and neither was there
much wording in the body of the email aside from asking the then-Budget
Officer Ginger Ostro to look at the attached spreadsheet or document. Thus,
there would not be any way to further narrow the search aside for asking for
"[a]ll emails sent from Grace Akinlemibola to Ginger Ostro from July 1, 2012
through August 31, 2012." Exh. D at 1.

119.    Plaintiff also asked for other items that Plaintiff distinctly recalled and
would have assisted in allowing the public to recognize the protocol of the
Mayor's Office and the City of Chicago.

120.    The second listed item for the Chicago Public Schools FOIA request asked for a particular email that Ginger Ostro was on the email chain with certain other employees of Chicago Public Schools. Among its many roles, the Budget Office is also required to understand the rationale for programmatic expenditures and provide and look for opportunities to enhance or minimize a budget as necessary. As Plaintiff was a Budget Analyst and had inquired and reviewed the budget that was approved prior to Plaintiff arriving and from which they were operating in that then-current budget cycle, Plaintiff had discovered the double-counting of $1 million in a department's budget from which Plaintiff was assigned. Plaintiff was reviewing the current and prior year budget expenditures as she had been at that time preparing for the upcoming budget cycle where a new budget would need to be prepared for the departments. Plaintiff had blatantly asked whether the Mayor's Office had approved the budget, where Plaintiff had not seen any type of detailed review that the Mayor's Office provided. Plaintiff asserts that the Mayor and the City of Chicago did not have protocol in place to properly hold the Budget Office accountable.

121.    In regards to oversight at Chicago Public Schools, Plaintiff had brought this issue up while in the Mayor's Office and had requested an email in a FOIA request in this regard, where Plaintiff had drafted a memorandum to Eileen Mitchell after meeting with the Chief Financial Officer in 2016 and discussing concerns of the lack of oversight by the Mayor's Office of Chicago Public Schools. Exh. A (listed as items 1 and 2). Plaintiff blatantly and expressly provided the groundwork for an actual systematic issue regarding the financial information systems used within Chicago Public Schools that require the budget office to be more particular about the budgets and from which Plaintiff expressed to an Information Systems and Technology team within Chicago Public Schools, where Plaintiff also followed up on this issue with an email during her time at CPS and provided this issue on multiple occasions to the Budget Director. Exh. D at 1. Plaintiff knew this issue to be a large reason for discrepancy for department directors or budget office members who were not a part of that department's budget for that term. When Plaintiff had

brought this issue to the Budget Director's attention, she was told to talk to the information systems group within Chicago Public Schools. This issue was not fixed during her time at Chicago Public Schools and the City of Chicago's Chief Financial Officer in 2016 had stated that if Chicago Public Schools was aware of the issue in 2012 then the Mayor's Office should not be involved.

122.   In January of 2017, Plaintiff had also relayed relevant information to media outlets and other members of the press. She also intended to also relay relevant emails to these same members.

123.   On February 19, 2017, Plaintiff started an online blog as attached to her current business ventures – www.gacbusiness.com/blog-1 -- that also discussed and provided public scrutiny and opinions on government policies and protocol.

124.   The lack of the relevant emails from the previously mentioned FOIA requests hinder the public's scrutiny of the State of Illinois and the City of Chicago's protocol, practices, and use of public funds.

125.   Plaintiff asserts that Defendants circumvented Plaintiff's FOIA requests so as to hinder Plaintiff's public criticism of RAHM EMANUEL, the CITY OF CHICAGO, and CHICAGO PUBLIC SCHOOLS.

### SPIKE LEE, FR. MICHAEL PFLEGER, AND *CHI-RAQ* FILM

126.   As a derivative of the fraudulent culture created by Defendants RAHM EMANUEL, MICHAEL RENDINA, and others in the Chicago Mayor's Office, Plaintiff's reputation was also maligned within the community.

127.   Since July 19, 2015, Plaintiff was a member of The Faith Community of St. Sabina ("St. Sabina"), a community-oriented Catholic church on Chicago's South Side.

128.   Plaintiff joined St. Sabina specifically after having a spiritual reconciliation, where Plaintiff was told spiritually to go to St. Sabina.

129.   St. Sabina is headed by Senior Pastor, Father Michael Pfleger.

130.   Father Michael Pfleger is very good friends with Mayor Rahm Emanuel and has friendships and qualitative relationships with many members of the

Chicago Mayor's Office, elected officials, and others having strong ties to the Mayor's Office, including long-time St. Sabina staff members who worked for Rahm Emanuel and alongside Defendants MICHAEL RENDINA, ANNA VALENCIA, SEAN RAPELYEA and others in previous years.

131.    One of these long-time staff members was Leonard Langston, who was an Executive Director with St. Sabina. Langston also previously worked alongside Plaintiff and Defendants SEAN RAPELYEA and ANNA VALENCIA on the Mayor's first campaign for Mayor in 2011. Langston worked alongside MICHAEL RENDINA as MICHAEL RENDINA's Chief-of-Staff while RENDINA was the Director of Legislative Affairs at CHICAGO PUBLIC SCHOOLS. Langston also was chosen by RAHM EMANUEL, ANNA VALENCIA, and others to work as RAHM EMANUEL's Political Director during Emanuel's second campaign in 2015.

132.    While Langston and Plaintiff were good friends prior to Plaintiff joining St. Sabina from previously working together, Plaintiff and Langston's friendship started to not be as close as it once was after Plaintiff joined St. Sabina in July of 2015.

133.    Father Michael Pfleger was well-known for social activism and social justice within the community.

134.    When Plaintiff joined St. Sabina, she had requested to meet with Father Michael Pfleger as a means of seeking mentorship as it related to visions, dreams, and prophecies.

135.    Plaintiff had initially gotten involved with the Choir Ministry, the Prayer Ministry, and the New Members Ministry.

136.    At or around Plaintiff's joining St. Sabina, Chicago Mayor Rahm Emanuel and a few aldermen in Chicago City Council, including former 4th Ward Alderman Will Burns and Alderman David Moore, had vocalized dissent to the title of the new Spike Lee film being called *Chi-Raq*.

137.    After Plaintiff had joined, she had noticed that Father Michael Pfleger would consistently give heated words against Chicago Mayor Rahm Emanuel and other elected officials to the point where Plaintiff had started to feel

conflicted in being a member at St. Sabina while working as a member in Rahm Emanuel's office.

138.    At or around September of 2015, Plaintiff had written a letter to Father Michael Pfleger and Father Thulani Magwaza. In this letter, Plaintiff started off by discussing parts of her spiritual journey. She disclosed that she was molested when she was six years old and had dealt with issues of lust as a youth, although never engaging in sexual intercourse until she had lost her virginity to a man she had previously intended to marry in the summer before her first year of college. She disclosed that she had been physically abstinent from sexual intercourse for approximately seven years by that point based on a spiritual commitment. She had disclosed how she had grown up in and around the church, but had recently become saved immediately prior to joining the church and was told by God to come to St. Sabina. She also disclosed additional details about her background, including how she had understood so much more about herself and successful ways of overcoming demons after being saved.

139.    At the end of the letter, she mentioned she worked in the Mayor's Office and worked in legislative counsel and government affairs, where she worked on the government affairs team with elected officials. At the time, Plaintiff's title was "Assistant to the Mayor."

140.    Plaintiff did not state her actual title in the letter, but her title was known by church leaders and posted on her public profiles.

141.    In the letter, she had attempted to reconcile any issues between Rahm Emanuel, City Council aldermen, and Father Michael Pfleger. She had also mentioned Father Pfleger's diatribe additionally against Alderman David Moore and had stated that he was someone who Plaintiff had seen to have good intentions. She then mentioned that she would appreciate if Father Pfleger would not speak so directly and blatantly and negatively about Rahm Emanuel, where she had remembered Father Pfleger calling the Mayor "a demon" during one sermon.

142.    Father Michael Pfleger responded by castigating Plaintiff at various opportunities, by ridiculing "those who send him letters" and demonizing Plaintiff with various references.

143.    Spike Lee and Father Michael Pfleger were very good friends, especially since Spike Lee was at the time producing *Chi-Raq* which featured a character modeled after Father Michael Pfleger.

144.    Plaintiff had found that with Father Michael Pfleger's consistent demonizing of her character, other members and church leaders in the church began to also look down on Plaintiff.

145.    Spike Lee and members of the *Chi-Raq* cast were frequent visitors of St. Sabina during this time, produced part of *Chi-Raq* at St. Sabina, allowed St. Sabina members to serve as extras in the film, and had many other frequent reciprocating opportunities for St. Sabina members.

146.    Spike Lee released *Chi-Raq* on December 4, 2015.

147.    Plaintiff watched *Chi-Raq* in theaters during the opening weekend and was shocked and horrified to find that there ridiculing references to her esteem in the film through the female lead character, Lysistrata.

148.    In the film, Lysistrata was said to have been "a Secretary" for the current Chicago Mayor, where the Mayor was angry about his Secretary "now leading a revolution." Lysistrata was the lead character who used her sexuality to negotiate a peace movement to end the violence in Chicago's South Side. She also used sex directly to negotiate a "deal" at the end of the film. Lysistrata also was homeless at one point and started organizing in the community.

149.    Plaintiff found parallels that were meant to be points of ridicule to her esteem and her endeavors. Plaintiff had lost her first home in a foreclosure. Plaintiff had been and has continued to be highly involved in community organizing, protesting, and was the previous Chair of the Midwest Black Law Students Association, where the group had partnered with a chapter law school to provide the *State of Black Chicago* in early 2015. Furthermore, while Lysistrata was labeled as the Mayor's "former Secretary," Plaintiff had previously served as an "Assistant to the Mayor," which Plaintiff believed the

intention was to send a derogatory message to the Plaintiff. Plaintiff also frequently wore her hair in the same natural "afro" as Lysistrata in the film.

150.    One of Plaintiff's lines of business in her new company was to produce films, short series, and other relevant initiatives. While the company has yet to produce their first film, they are currently seeking to finish their first product. Plaintiff's entry into the film producing industry makes *Chi-Raq*'s references by Spike Lee even more damaging to Plaintiff's reputation.

151.    After watching the film, Plaintiff left all active ministries in St. Sabina and had wanted to leave St. Sabina, but felt that God did not want her to leave St. Sabina at that point so she had stayed.

152.    Plaintiff later rejoined the Prayer Ministry.

153.    Years later, after Plaintiff had found that Father Michael Pfleger had seemingly stopped harassing Plaintiff, Plaintiff attempted to reconcile.

154.    She had joined Father Michael Pfleger on one of his weekly Peace Marches within the neighborhood and initiated a political planning event for her former democratic organization group to support. She had asked Father Pfleger to announce her group at the event and while he had claimed he would do so, he made no effort to do so even upon her reminder.

155.    After filing the initial lawsuits in January of 2017, Plaintiff organized an Anti-Corruption March on February 21, 2017. She emailed Father Michael Pfleger to ask for his support regarding the march. He declined without a reason and then announced in church the following Sunday that he was supporting another march approximately a week later and encouraged attendees to support. He never made mention of Plaintiff's march on that Sunday or any subsequent Sundays.

156.    Plaintiff had then intended to reconcile any disputes between Plaintiff and Father Michael Pfleger as she had been thinking about relocating her company's headquarters outside of Chicago and the state of Illinois.

157.    Plaintiff requested a meeting with Father Michael Pfleger by sending him an email on two separate occasions to secure a meeting with him. Father Michael Pfleger never met with Plaintiff.

158.   On April 19, 2017, Plaintiff relocated her company's headquarters to New York City.

## CHICAGO POLICE DEPARTMENT'S ARREST OF PLAINTIFF'S EMPLOYEE

159.   After initially filing these lawsuits on January 13, 2017, Plaintiff was met with further disturbance from the Mayor's Office.

160.   The day after Plaintiff filed the first five lawsuits in district court, one of her employees in her business was harassed by four white male police officers, where one of the officers called him a "nigger," locked in a jail cell where he was unable to even use the bathroom and thus urinated in the jail cell. Plaintiff filed the sixth lawsuit in relation to these acts a week later.

161.   On January 13, 2017, Plaintiff filed 5 separate lawsuits surrounding corrupt acts in and beyond the city of Chicago and the state of Illinois. Plaintiff, a former employee of City of Chicago Mayor Rahm Emanuel, filed these 5 lawsuits against Rahm Emanuel, City of Chicago, State of Illinois, and the Illinois Supreme Court amongst other parties. Plaintiff then posted about all of these Anti-Corruption Lawsuits online almost immediately upon filing the complaints.

162.   On January 14, 2017, the day after filing her lawsuits in federal court, an employee of Plaintiff's was grabbed by four white male police officers on the intersection of State Street and Lake Street.

163.   The police officers accused Plaintiff's employee, Hilton Wright, of panhandling before forcing him to be searched and arrested by the police officers.

164.   During the arrest, police officers called Plaintiff's employee a "nigger" and, although the employee had never met any of the police officers before that day, the four white male police officers ridiculed him for being uneducated.

165.   Plaintiff's employee was formerly homeless and had never graduated from high school.

166.   Wright was taken to the First District Police Station, where he was placed in a jail cell. Wright asked to use the bathroom and was denied by officers.

167.  Wright was then forced to urinate in his jail cell.

168.  Police officers released Wright late that evening.

### REGUS AND 203 N. LASALLE ST.

169.  In September of 2016, while Plaintiff was still an employee in Rahm
      Emanuel's office, Plaintiff contracted office space with Regus PLC, where
      Plaintiff had dealt with Kimberly Clarke, the Sales Manager for the 203 N
      LaSalle St location at Regus, in contracting the space.

170.  The office provided 24-hour access by tenants and occupants.

171.  Plaintiff understood that Regus PLC had many tenants whom they
      contracted with in the same location who had close ties to Chicago Mayor
      Rahm Emanuel.

172.  Plaintiff was soon thereafter, in October of 2016, provided an ultimatum in
      the Mayor's Office to either dissolve her business or resign from her post in
      the Mayor's Office. As Plaintiff refused to dissolve her business or resign, she
      was terminated from the Mayor's Office on October 31, 2016.

173.  Plaintiff immediately began focusing her complete efforts towards her
      business.

174.  Plaintiff dealt with consistent behavior from Regus PLC staff that was
      disparate in comparison to other tenants in the building's location.

175.  Plaintiff had ordered for her business logo sign from Regus PLC and, while
      other tenants were able to receive their business logo signs within two weeks,
      Regus did not provide her business logo until after Plaintiff continued to
      complain and thereafter received it after two months.

176.  When Plaintiff had attempted to expand with new employees that were
      starting at the end of December of 2016, Regus PLC refused to accommodate
      Plaintiff in accordance with the same standards and benefits others enjoyed.
      One employee, who was an attorney, left the very same day she was intended
      to start after finding out she would not be able to have equal office
      accommodations similar to the other employees.

177.  Regus PLC would attempt to force Plaintiff to pay for the upcoming rent
      over a month in advance. When Plaintiff did not pay the rent over a month in

advance, Regus PLC suggested to at least two of her employees to start looking for other office spaces.

178.    Plaintiff had attempted to discuss a dispute with the billing invoice with Erica Fernandez, the new Sales Manager at REGUS PLC's 203 N LaSalle St. location, but was met with abrasive behavior. Plaintiff made Fernandez aware that Plaintiff had been treated with rude and disparate treatment in the past and wanted to be treated with the same respect and standards as the others.

179.    Plaintiff filed the Anti-Corruption Lawsuits initially on January 13, 2017 against Mayor Rahm Emanuel and others.

180.    On February 13, 2017, Plaintiff hosted a press conference regarding the Anti-Corruption Lawsuits.

181.    Plaintiff had prepared to host the press conference in the building's common area on the first floor of 203 N. LaSalle St. She had sought to reserve the space through Regus PLC and was unaware of the process to reserve the space. She had sent an email to Margaret Brophy, a Leasing Manager for M&J Wilkow regarding the first floor and then reached out to the Building Security on the first floor to find out who she could speak with and was directed to Sallie Fulwiler, the Building Manager for 203 N. LaSalle St. and M&J Wilkow.

182.    Plaintiff called Fulwiler to reserve the common space on the first floor and was rudely rebuked. Plaintiff then attempted to look for other options and was referred the second floor common area lounge space for building residents.

183.    Plaintiff sent an email to Brophy, a Leasing Manager for 203 N. LaSalle St. to let her know that she had found a space for the press conference.

184.    On the day of the press conference, Fulwiler was rude and abrasive when she came into the second floor lounge where Plaintiff was set up for the press conference. She ordered Plaintiff to leave the lounge and stated that she had a meeting set up in the lounge for building management.

185.    Plaintiff questioned Fulwiler as to her demeanor, but was met with insolence behavior, loud aggression, and abrasive actions. Without provocation and even while Plaintiff and one of Plaintiff's employees were in the process of packing their belongings, Fulwiler snatched Plaintiff's posters with Plaintiff's name and picture on the podium from visibility off of the

podium and started attempting to push Plaintiff before Plaintiff responded in kind.

186. Plaintiff had then attempted to move the press conference to a conference room near her own office, but Building Security and Building Management prohibited any members of the press from setting up cameras in the building as two press members with cameras arrived with one from Fox News and another from Univision.

187. Plaintiff ultimately had to move her press conference outside of the building, where she then rushed in giving her remarks.

188. Weeks later, on March 13, 2017, Plaintiff dealt with another situation where the elevators stopped working after hours. Plaintiff routinely works late in her office during the week and on the weekends while oftentimes staying in her office throughout the night. One day where Plaintiff was working late, Plaintiff had wanted to run outside to get food and come back to the office but she could not leave the 21st floor in the building because the elevators had stopped working. The time was approximately 12:30 a.m. Plaintiff was particularly concerned since she was trapped on the 21st floor with an unidentified male whom she had never seen. When Plaintiff had also attempted to then find out whether the stairs was available after seeing this individual, the door to the staircase seemed to have been initially stuck. Plaintiff ultimately returned back to her office but informed the building of the circumstances.

189. On April 21, 2017, Plaintiff was again working late and had intended to work through the night and into April 22, 2017. At approximately 2:25 a.m., she had left the building to get food and return to her office. When Plaintiff left the building, she left her bag, phone, and other belongings in her office. When she attempted to get back into the building, she was stopped in the lobby by the Building Security at the front desk.

190. The man informed her that she could not come back into the building or go upstairs to her office. He further informed her that she was unable to get back into the building because they had an internal memorandum that specifically banned "Grace Akinlemibola" from entering the building outside

of "regular building hours," where the building hours were from 8:30 a.m. to 6 p.m.

191.   Plaintiff expressed confusion to the individual because she was never informed about any policy that included banning her in-and-out access to her office space, especially where she was widely known to consistently work late nights.

192.   Prior to that day, Plaintiff had started to take work home over the prior three weeks and leave the office at earlier hours of 8 p.m. or later with a few nights leaving at or slightly past midnight.

193.   The man further informed her that this "policy" was implemented approximately two weeks ago. He called an additional Security individual who also confirmed that Plaintiff would not be able to go back upstairs to her office because she was specifically banned from doing so.

194.   When Plaintiff asked if anyone else was able to come into the building throughout the night or after building hours, they replied affirmatively and stated that this policy was only directed towards her.

195.   Plaintiff was upset and asked if she could simply get her phone and bag upstairs and she would willingly leave the building.

196.   Plaintiff was particularly upset because as it was a Friday evening/early Saturday morning, anything that was left in her office would be unable to be retrieved until Monday morning when the regular building hours resumed.

197.   Both of the security members refused Plaintiff's request.

198.   They called their Acting Director of Security, who went by the name of Toy. Toy informed her she would not only be unable to continue working in her office that evening, but she would also be unable to get back upstairs to get her belongings.

199.   Plaintiff called the police.

200.   Two individuals from the CHICAGO POLICE DEPARTMENT's First District came to the scene. The individuals talked to the Building Security and asked to obtain access to Plaintiff's office.

201.   The Building Security denied their request.

202.   Plaintiff further explained that she needed her belongings, her phone and her bag, and she would gladly leave the building for that day. Since her flash drives with her work products, notes, phone, and bag were all in her office, she would be incapacitated in furthering very important objectives and deadlines for the following week.

203.   The Building Security consistently denied Plaintiff's requests and the requests from the CHICAGO POLICE DEPARTMENT.

204.   Plaintiff then requested to file a police report to report theft, fraud, and extortion from REGUS and M&J Wilkow's Building Management.

205.   CHICAGO POLICE DEPARTMENT denied her request to file a police report, stating that "no crime has occurred."

206.   Plaintiff was highly upset and insisted that her belongings were trapped upstairs and she was barred access by the Building. No one informed her of any new policy to bar her from her office space after building hours, especially when it was widely known throughout Building management how she typically worked late hours. Plaintiff was simply acting in accordance to her usual working behavior, and now Plaintiff will be *unjustifiably deprived* of her property for over two days which would dramatically change her working prosperity.

207.   Plaintiff further told police officers that at the very least, the question of whether a crime has or has not occurred would be a question of law for a judge to decide; however, Plaintiff should have every right to file a police report.

208.   CHICAGO POLICE DEPARTMENT continued to insist they will not file a police report. Plaintiff continued to get further upset and the officers then called for additional officers and their Sergeant to settle the matter.

209.   The Sergeant arrived with two additional officers, now making a total of five police officers on the scene.

210.   The Sergeant and the first officer who was insisting on not writing a police report discussed briefly before the Sergeant came inside of the lobby area and spoke with the Plaintiff.

211.    Plaintiff recounted the situation and informed them that she needed her belongings and she wanted to file a police report. While Plaintiff did not recall him directly answering her question about the police report initially, she recalled that he told her he would try to get her belongings for her.

212.    The Sergeant negotiated with Building Security to attempt to retrieve her belongings, but Building Security again insisted that she would be unable to retrieve her belongings and the officers would also be unable to get her belongings on her behalf.

213.    The Building Security then called Toy and Toy said she would soon arrive on the scene as well.

214.    When Toy arrived, the Sergeant spoke with her and she again insisted that Plaintiff, and no one on behalf of Plaintiff, would be able to go upstairs and retrieve Plaintiff's belongings.

215.    Plaintiff again insisted on filing a police report, further noting that CHICAGO POLICE DEPARTMENT not openly allowing citizens to file police reports, especially where crimes have been committed, is evidence of corruption at CHICAGO POLICE DEPARTMENT.

216.    The officers and the Building Security all attempted to rebut Plaintiff's accusations of a crime occurring by stating that Building Security did not "physically take" Plaintiff's belongings from her; however, if an invited guest were to arrive at a friend's home – maybe a working session or watching a Bulls game – and act in typical prior custom by leaving to make a coffee run and leaving their belongings at the friend's house, the friend suddenly not allowing you into their home *and not allowing you to retrieve your belongings* can now be considered theft, or even embezzlement. It is a question of law for a judge to decide whether a "taking" or "deprivation of property" has occurred if no facts are disputed, but *no one* should be deprived of their property without expectation, notice, or preparation.

217.    The Sergeant blatantly refused and reiterated that "no crime has occurred." He then informed her that if Plaintiff did not now leave the building, a crime will occur and he will arrest Plaintiff for criminal trespassing.

218.    Plaintiff was escorted out of the building by police officers, who then provided Plaintiff with a ride to her residence in Chicago.

219.    Plaintiff seeks compensatory relief in the form of compensatory and punitive damages.

220.    Plaintiff accordingly brings this action to not only protect herself and her value, but to also seek justice.

## COMPLAINTS AGAINST DEFENDANTS

### COUNT I.

### §1983 Violation of First Amendment Freedom of Speech

221.   Plaintiff reasserts and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

222.   As a direct result of the Defendants' acts, the Plaintiff has sustained emotional injuries, economic injuries, reputational injuries, and opportunity costs.

223.   In order to be made whole, Plaintiff respectfully requests compensatory and punitive damages for the fraudulent acts performed by Defendants.

### COUNT II.

### §1983 Violation of First Amendment Freedom of Press

224.   Plaintiff reasserts and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

225.   As a direct result of the Defendants' acts, the Plaintiff has sustained emotional injuries, economic injuries, reputational injuries, and opportunity costs.

226.   In order to be made whole, Plaintiff respectfully requests compensatory and punitive damages for the fraudulent acts performed by Defendants.

### COUNT III.

### §1983 Violation of the Thirteenth Amendment

227.   Plaintiff reasserts and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

228.   While the Thirteenth Amendment's violation against slavery and involuntary servitude has been historically also used to bar against forced labor, Plaintiff extends the use of this constitutional amendment to the current facts. Plaintiff was imprisoned by the fraudulent use of her spreadsheet analysis to close 50 Chicago Public Schools and thus was deprived of free will because (1) Plaintiff has been forced to participate in the

closing of schools and, (2) because of this participation, Plaintiff was forced to be relegated to the outskirts of basic civil rights.

229.   As a direct result of the Defendants' acts, the Plaintiff has sustained emotional injuries, economic injuries, reputational injuries, and opportunity costs.

230.   In order to be made whole, Plaintiff respectfully requests compensatory and punitive damages for the fraudulent acts performed by Defendants.

## COUNT IV.

### §1983 Violation of Due Process

231.   Plaintiff reasserts and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

232.   Plaintiff was imprisoned by the fraudulent use of her spreadsheet analysis to close 50 Chicago Public Schools and thus was deprived of free will because (1) Plaintiff has been forced to participate in the closing of schools and, (2) because of this participation, Plaintiff was forced to be relegated to the outskirts of basic civil rights.

233.   As a direct result of the Defendants' acts, the Plaintiff has sustained emotional injuries, economic injuries, reputational injuries, and opportunity costs.

234.   In order to be made whole, Plaintiff respectfully requests compensatory and punitive damages for the fraudulent acts performed by Defendants.

## COUNT V.

### Fraudulent Misrepresentation

235.   Plaintiff reasserts and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

236.   Defendant GINGER OSTRO lied when she asked Plaintiff to create a spreadsheet to discover additional funds. Instead, it is Plaintiff's contention that Defendant had the mind of closing schools – although Plaintiff had never before heard Defendant discuss closing schools – and, as Plaintiff had already

announced she was leaving CPS, Defendant intended to use Plaintiff's product to "blame the data" on a "former employee."

237.   Plaintiff relied on Defendant's request.

238.   As a direct result of the Defendants' acts, the Plaintiff has sustained emotional injuries, economic injuries, reputational injuries, and opportunity costs.

239.   In order to be made whole, Plaintiff respectfully requests compensatory and punitive damages for the fraudulent acts performed by Defendants.

## COUNT VI.
### <u>Negligence</u>

240.   Plaintiff reasserts and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

241.   CHICAGO PUBLIC SCHOOLS used Plaintiff's spreadsheet analysis to justify the closing of Chicago Public Schools without taking reasonable steps to fact-check.

242.   As a direct result of the Defendants' acts, the Plaintiff has sustained emotional injuries, economic injuries, reputational injuries, and opportunity costs.

243.   In order to be made whole, Plaintiff respectfully requests compensatory and punitive damages for the fraudulent acts performed by Defendants.

## COUNT VII.
### <u>Fraudulent Conversion</u>

244.   Plaintiff reasserts and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

245.   As a direct result of the Defendants' acts, the Plaintiff has sustained emotional injuries, economic injuries, reputational injuries, and opportunity costs.

246.   In order to be made whole, Plaintiff respectfully requests compensatory and punitive damages for the fraudulent acts performed by Defendants.

## COUNT VIII.

### <u>(In the alternative to Count VII) Conversion</u>

247.    Plaintiff reasserts and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

248.    As a direct result of the Defendants' acts, the Plaintiff has sustained emotional injuries, economic injuries, reputational injuries, and opportunity costs.

249.    In order to be made whole, Plaintiff respectfully requests compensatory and punitive damages for the fraudulent acts performed by Defendants.


## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury of all issues so triable pursuant to FRCP 38(b)(1) and 38(c).

## **PRAYER FOR RELIEF**

The Plaintiff, GRACE AKINLEMIBOLA, respectfully requests that the Court enter a judgment in her favor and against the Defendants as outlined below. For Plaintiff's pain, emotional and mental suffering, infringed constitutional rights, and other damages as previously mentioned, Plaintiff is requesting a total amount of $1,000,000,000 ($1 billion dollars) as follows:

   a.  Awarding compensatory damages,
   b.  Awarding punitive damages,
   c.  Awarding the costs of court and trial expenses, and
   d.  Awarding such other and further relief as the Court determines just and proper.

Dated this 27th day of April, 2017.

Respectfully submitted,

By: GRACE AKINLEMIBOLA
15 W 124th St.
New York City, NY 10027
PRO SE

## VERIFICATION BY CERTIFICATION

I, Grace Akinlemibola, am the Plaintiff in the foregoing action. I drafted the foregoing complaint and know the contents thereof. The contents and statements set forth are true and correct to my own knowledge, except as to matters therein stated to be on information and belief, and as to such matters I verily believe the same to be true.

_____
GRACE AKINLEMIBOLA


Signed and sworn to before me this _____28_____ day of _____Apl_____, 2017.

_____
Notary Public

CUI YING LI
Notary Public, State of New York
No. 01LI6303092
Qualified in New York County
Commission Expires May 12, 20__18

# Exhibit

# A

# FOIA Requests

*January 23, 2017*

| | Description | Due Date |
|---|---|---|
| 1 | All sent or received emails from or to Grace Akinlemibola of or concerning "Chicago Public Schools" from April 2016 through November 2016 where Grace Akinlemibola discussed oversight of Chicago Public Schools. | January 26, 2017 |
| 2 | All sent emails, including attachments, from Grace Akinlemibola of or concerning "Chicago Public Schools" from March 2016 through November 2016 where Grace Akinlemibola discussed oversight of Chicago Public Schools. | January 26, 2017 |
| 3 | All sent emails from Grace Akinlemibola to Eileen Mitchell of or concerning "Chicago Public Schools" from July 1, 2015 through August 31, 2015 where Grace Akinlemibola asked for a particular written passage be sent to the press. | January 26, 2017 |
| 4 | All sent or received emails from or to Michael Rendina of or concerning "Chicago Public Schools" from July 1, 2015 through August 31, 2015. | January 26, 2017 |
| 5 | All sent or received emails from or to David Spielfogel of or concerning "Chicago Public Schools" from July 1, 2015 through August 31, 2015. | January 26, 2017 |
| 6 | All sent or received emails from or to Lisa Schrader of or concerning "Chicago Public Schools" from July 1, 2015 through August 31, 2015. | January 26, 2017 |
| 7 | All emails that outlined Rahm Emanuel's daily schedule and was sent from July 1, 2015 through August 31, 2015. | January 26, 2017 |
| 8 | All sent emails, including attachments, from Grace Akinlemibola of or concerning "accountability," "reforms," "strategy," "redevelopment on south and west sides" from November 2015 through November 2016 where Grace Akinlemibola. | January 26, 2017 |

# Exhibit

# B


AKINLEMIBOLA

Grace Akinlemibola <gakinlem@gacbusiness.com>

## Mayor's Office FOIA Requests

**MOFOIA** <MOFOIA@cityofchicago.org>
To: MOFOIA <MOFOIA@cityofchicago.org>, Grace Akinlemibola <gakinlem@gacbusiness.com>

Tue, Feb 21, 2017 at 4:52 PM

Please see attached.


Thank you,


Chloe Rasmas

312-744-3844


**From:** MOFOIA
**Sent:** Friday, February 10, 2017 5:16 PM
**To:** 'Grace Akinlemibola'; MOFOIA
**Subject:** RE: Mayor's Office FOIA Requests


Please see attached request for an extension.


Thank you,


Chloe Rasmas

312-744-3844


**From:** Grace Akinlemibola [mailto:gakinlem@gacbusiness.com]
**Sent:** Thursday, February 02, 2017 7:29 PM
**To:** MOFOIA
**Subject:** RE: Mayor's Office FOIA Requests


Chloe,

You had said that *each* search term produced over 10,000 items, which is clearly not the case even by the items you provided. I also had very specific search criteria, where I had indicated whether I was sending our receiving the email. Also does this indicate the number of times the term(s) appears in an email because many of these I know, for a fact, there are not all of these emails that came from my inbox either as one who was sending or receiving, unless my email was forwarded to many different people and thus it enlarged the number of emails. In those cases, **can you just use** *my original* **email as requested?** I think that should clear up any discrepancies. Can you provide those emails with the clarification that I provided in this email? For item #3, you can narrow to those emails from July 10, 2015 through July 31, 2015.

Thanks.

Grace


On Feb 2, 2017 4:55 PM, "MOFOIA" <MOFOIA@cityofchicago.org> wrote:

Dear Grace:


In fact, the search terms you provided yielded a total of 10,872 emails.  To assist you in narrowing your request, I am providing you the following log reflecting the number of emails yielded by each portion of your request.

1)      Inbox: Grace Akinlemibola = 1,807 items

a.              Keyword: "Chicago Public Schools"

b.              Time Frame: April 2016 – November 2016

3/7/2017                                           The Grace Akinlemibola Corporation Mail - Mayor's Office FOIA Requests

2)   *Correspondence between Eileen Mitchel and Grace Akinlemibola* = 4 items

a.        Keyword: "Chicago Public Schools"

b.        Time Frame: March 2016 – November 2016

3)   Inbox: Grace Akinlemibola = 832 items

a.        Keyword: "Chicago Public Schools"

b.        Time Frame: July 1, 2015 – August 31, 2015

4)   Inbox: Mike Rendina = 1,596 items

a.        Keyword: "Chicago Public Schools"

b.        Time Frame: July 1, 2015 – August 31, 2015

5)   Inbox: David Spielfogel = 2,367 items

a.        Keyword: "Chicago Public Schools"

b.        Time Frame: July 1, 2015 – August 31, 2015

6)   Inbox: Lisa Schrader = 628 items

a.        Keyword: "Chicago Public Schools"

b.        Time Frame: July 1, 2015 – August 31, 2015

7)   Inbox: Grace Akinlemibola = 3,638 items

a.        Keyword: "accountability" OR "reforms" OR "strategy" OR "redevelopment on south and west sides"

b.        Time Frame: November 2015 – November 2016


Please let me know if you would like to limit your request by the use of narrower search terms, time periods, or other means.


**From:** Grace Akinlemibola [mailto:gakinlem@gacbusiness.com]
**Sent:** Wednesday, February 01, 2017 2:07 PM
**To:** MOFOIA
**Subject:** RE: Mayor's Office FOIA Requests


Chloe,

This is a complete lie. For you to claim that using those search terms produced over 10,000 hits for each item, is a complete lie. I think you forget that I AM Grace Akinlemibola. I know for a fact that my search criteria of emails sent by me over the course of 2 months regarding SPECIFIC search criteria would produce less than 100 emails IF that. Now, if you do not want yourself named as one who is fraudulently obstructing a just outcome, I suggest you hand over the emails.

Thanks.

Grace


On Jan 30, 2017 5:01 PM, "MOFOIA" <MOFOIA@cityofchicago.org> wrote:

Please see attached.


Thank you,


Chloe Rasmas

312-744-3844


**From:** Grace Akinlemibola [mailto:gakinlem@gacbusiness.com]
**Sent:** Monday, January 23, 2017 1:08 PM
**To:** MOFOIA
**Subject:** Mayor's Office FOIA Requests


Good afternoon,

3/7/2017                    The Grace Akinlemibola Corporation Mail – Mayor's Office FOIA Requests

Please see the below FOIA requests with my information as outlined further.

**Name**: Grakin Corporation

**Mailing Address**: Attn: Grace Akinlemibola/▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**Contact Information**: Call (▓▓▓▓▓▓▓▓ for questions.

**Method**: Please send via email to gakinlem@gacbusiness.com and have it available for pickup by one of the staff members.

Requests as attached and as follows:

| | **Description** | **Due Date** |
|---|---|---|
| 1 | All sent or received emails from or to Grace Akinlemibola of or concerning "Chicago Public Schools" from April 2016 through November 2016 where Grace Akinlemibola discussed oversight of Chicago Public Schools. | January 26, 2017 |
| 2 | All sent emails, including attachments, from Grace Akinlemibola to Eileen Mitchell of or concerning "Chicago Public Schools" from March 2016 through November 2016 where Grace Akinlemibola discussed oversight of Chicago Public Schools. | January 26, 2017 |
| 3 | All sent emails from Grace Akinlemibola of or concerning "Chicago Public Schools" from July 1, 2015 through August 31, 2015 where Grace Akinlemibola asked for a particular written passage be sent to the press. | January 26, 2017 |
| 4 | All sent or received emails from or to Michael Rendina of or concerning "Chicago Public Schools" from July 1, 2015 through August 31, 2015. | January 26, 2017 |
| 5 | All sent or received emails from or to David Spielfogel of or concerning "Chicago Public Schools" from July 1, 2015 through August 31, 2015. | January 26, 2017 |
| 6 | All sent or received emails from or to Lisa Schrader of or concerning "Chicago Public Schools" from July 1, 2015 through August 31, 2015. | January 26, 2017 |
| 7 | All emails that outlined Rahm Emanuel's daily schedule and was sent from July 1, 2015 through August 31, 2015. | January 26, 2017 |
| 8 | All sent emails, including attachments, from Grace Akinlemibola of or concerning "accountability," "reforms," "strategy," "redevelopment on south and west sides" from November 2015 through November 2016 where Grace Akinlemibola. | January 26, 2017 |

--

**GRACE AKINLEMIBOLA**

Chief Executive Officer, The Grace Akinlemibola Corporation

President, Grakin Corporation

203 N. LaSalle St., Ste 2100

Chicago, IL 60601

**Tel**: (866) 358-4020  | **Cell**: ▓▓▓▓▓▓▓▓▓ | **Fax**: (312) 346-9603

www.gacbusiness.com

This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

**2 attachments**

**2.21.17AKINLEMIBOLA.pdf**
460K

**Responsive.pdf**
25953K

# Exhibit

# C



## OFFICE OF MAYOR RAHM EMANUEL

### CITY OF CHICAGO

February 21, 2017

Grace Akinlemibola
gakinlem@gacbusiness.com

Dear Ms. Akinlemibola,

On behalf of the City of Chicago Office of the Mayor ("Mayor's Office"), I am responding to your narrowed Freedom of Information Act ("FOIA") request. On February 10, 2017 the Mayor's Office sent the statutory request for a five-day extension and is now timely responding to your FOIA.

In your original request, dated January 23, 2017 you sought:

1. *All sent or received emails from or to Grace Akinlemibola of or concerning "Chicago Public Schools" from April 2016 through November 2016 where Grace Akinlemibola discussed oversight of Chicago Public Schools.*
2. *All sent emails, including attachments, from Grace Akinlemibola to Eileen Mitchell of or concerning "Chicago Public Schools" from March 2016 through November 2016 where Grace Akinlemibola discussed oversight of Chicago Public Schools.*
3. *All sent emails from Grace Akinlemibola of or concerning "Chicago Public Schools" from July 1, 2015 through August 31, 2015 where Grace Akinlemibola asked for a particular written passage be sent to the press.*
4. *All sent or received emails from or to Michael Rendina of or concerning "Chicago Public Schools" from July 1, 2015 through August 31, 2015.*
5. *All sent or received emails from or to David Spielfogel of or concerning "Chicago Public Schools" from July 1, 2015 through August 31, 2015.*
6. *All sent or received emails from or to Lisa Schrader of or concerning "Chicago Public Schools" from July 1, 2015 through August 31, 2015.*
7. *All emails that outlined Rahm Emanuel's daily schedule and was sent from July 1, 2015 through August 31, 2015.*
8. *All sent emails, including attachments, from Grace Akinlemibola of or concerning "accountability," "reforms," "strategy," "redevelopment on south and west sides" from November 2015 through November 2016 where Grace Akinlemibola.*

On January 30, 2017, the Mayor's Office timely provided records responsive to part seven of your request for the Mayor's daily schedule. Regarding the remaining items in your request, we cited 5 ILCS 140/3(g), that requests for all records falling within a category shall be complied with unless compliance with the request would be unduly burdensome for the complying body and there is no way to narrow the request and the burden on the public body outweighs the public interest in the information.

We explained "Using the keywords in quotations as they were provided in each request, the searches resulted in more than 10,000 total hits," and that because it is estimated that it would take, at a minimum, 1 hour to review, redact, and produce 20 documents, it would take approximately 500 hours to review, redact, and produce the emails and correspondence that you requested. We stated that complying with your request as written would place an undue burden on the daily operations of the Mayor's Office.

On February 1, 2017 you stated:

> This is a complete lie. For you to claim that using those search terms produced over 10,000 hits for each item, is a complete lie. I think you forget that I AM Grace Akinlemibola. I know for a fact that my search criteria of emails sent by me over the course of 2 months regarding SPECIFIC search criteria would produce less than 100 emails IF that. Now, if you do not want yourself named as one who is fraudulently obstructing a just outcome, I suggest you hand over the emails.

On February 2, 2017 we stated the following:

> In fact, the search terms you provided yielded a total of 10,872 emails.  To assist you in narrowing your request, I am providing you the following log reflecting the number of emails yielded by each portion of your request.
>
>    1. Inbox: Grace Akinlemibola = 1,807 items
>       Keyword: "Chicago Public Schools"
>       Time Frame: April 2016 – November 2016
>    2. *Correspondence between Eileen Mitchel and Grace Akinlemibola* = 4 items
>       Keyword: "Chicago Public Schools"
>       Time Frame: March 2016 – November 2016
>    3. Inbox: Grace Akinlemibola = 832 items
>       Keyword: "Chicago Public Schools"
>       Time Frame: July 1, 2015 – August 31, 2015
>    4. Inbox: Mike Rendina = 1,596 items
>       Keyword: "Chicago Public Schools"
>       Time Frame: July 1, 2015 – August 31, 2015
>    5. Inbox: David Spielfogel = 2,367 items
>       Keyword: "Chicago Public Schools"
>       Time Frame: July 1, 2015 – August 31, 2015
>    6. Inbox: Lisa Schrader = 628 items
>       Keyword: "Chicago Public Schools"
>       Time Frame: July 1, 2015 – August 31, 2015
>    7. Inbox: Grace Akinlemibola = 3,638 items
>       Keyword: "accountability" OR "reforms" OR "strategy" OR "redevelopment on south and west sides"
>       Time Frame: November 2015 – November 2016
>
> Please let me know if you would like to limit your request by the use of narrower search terms, time periods, or other means.

On the evening of February 2, 2017 you stated:

> You had said that each search term produced over 10,000 items, which is clearly not the case even by the items you provided. I also had very specific search criteria, where I had indicated whether I was sending our receiving the email. Also does this indicate the number of times the term(s) appears in an email because many of these I know, for a fact, there are

not all of these emails that came from my inbox either as one who was sending or receiving, unless my email was forwarded to many different people and thus it enlarged the number of emails. **In those cases, can you just use my *original* email as requested?** I think that should clear up any discrepancies. Can you provide those emails with the clarification that I provided in this email? For item #3, you can narrow to those emails from July 10, 2015 through July 31, 2015.

In regards to you narrowed request, "For item #3, you can narrow to those emails from July 10, 2015 through July 31, 2015," responsive records are attached and were redacted pursuant to the IL FOIA. Specifically, personal phone numbers were redacted pursuant to Section 7(1)(b) of FOIA. 5 ILCS 140/7(1)(b) exempts from disclosure, "private information." Private information is defined in Section 2(c-5) as, "...unique identifiers, including a person's social security number, driver's license number, employee identification number, biometric identifiers, personal financial information, passwords or other access codes, medical records, home or personal telephone numbers, and personal emails addresses. Private information also includes home address and personal license plates, except as otherwise provided by law or when compiled without possibility of attribution to any person." 5 ILCS 140/2(c-5). Therefore personal phone numbers are exempt pursuant to Section 7(1)(b) and were properly redacted.

Additionally, we are also redacting certain information related to family members and extended relatives, which appears in one of the documents. Such information is also exempt pursuant to Section 7(1)(c) of FOIA. Section 7(1)(c) exempts from disclosure, "personal information contained within public records, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." Because information regarding family members is inherently private, and its release would be objectionable to a reasonable person, such information constitutes personal information which is exempt under Section 7(1)(c). Further, because the redacted information does not pertain to the transaction of business of the public body, there is no legitimate public interest in releasing the information.

Further, please note that these narrowed parameters produced 299 hits. 297 of them were newsclips or press releases that did not include correspondence between employees in the Mayor's Office. To the extent you would like to receive these items, please let us know. Additionally, please note that the term "Chicago Public Schools" when searched in seven different email searches will always produce several hundreds if not thousands of hits, due to the time frames requested, the multiple accounts you are requesting emails from, and the volume of newsclips contained daily in any one person's inboxes.

Regarding the remainder of your note dated February 2, 2017, please note our email retaining system does not have a search function to determine whether you were the sender or receiver of an email. We are only able to conduct a whole search of your account, with no distinction of inbox or outbox, unless we were to go into your inbox and separate them on our own individually, which due to the volume of more than 10,000 emails would be onerous. Further, I am seeking clarification to your statement, **"In those cases, can you just use my *original* email as requested,"** because I do not know if I am to interpret that to mean your original email submitting the FOIA request itself, or if you mean the original email in a chain of responsive emails. The latter has no meaning in terms of our production of emails, as emails are time stamped, and the term "original" does not apply.

We ask again that you clarify your request because combined the search results remain onerous.

If you agree to narrow your request, you must submit a revised written request to my attention. The Mayor's Office will take no further action or send you any further correspondence unless and until your current request is narrowed in writing. If we do not receive your narrowed request within fourteen (14) calendar days of the date of this letter, your current request will be denied.

To the extent that your FOIA request has been denied, you have a right of review by the Illinois Attorney General's Public Access Counselor, who can be contacted at 500 S. Second St., Springfield, IL 62706 or by telephone at (217) 558-0486.  You may also seek judicial review of a denial under 5 ILCS 140/11 of FOIA.

Sincerely,

Chloe K. Rasmas
Freedom of Information Officer

# Exhibit

# D

3/7/2017                                                   CPS



View My Requests | Update Your Contact Information | Logout

| | |
|---|---|
| **Request Type:** | Non-Commercial FOIA Request |
| **Contact E-Mail:** | gakinlem@gacbusiness.com |
| **Reference No:** | N002569-021517 |

---

**Select one record category for your FOIA request and then describe the specific records you are seeking in that category. Requests for records in multiple record categories must be submitted separately.**

**Type of Record Requested:** Other

**Describe the Record Requested:** I would like the following emails:

- All emails sent from Grace Akinlemibola to Ginger Ostro from July 1, 2012 through August 31, 2012.

- All emails from an email chain that began with an email from Grace Akinlemibola to Dana Brink and (maybe) Ginger Ostro, Dana Brink then added Aarti Dhupelia and Heather Wendell (if Ginger Ostro was not added in the original email, she would have been added by this reply email from Dana to Aarti where Dana forwarded Grace Akinlemibola's email), and the email chain would have ended with Aarti Dhupelia's response. Please search from January 2012 through August of 2012.

- All emails from Grace Akinlemibola to Leonore "Lee" Draper (I forgot whether she went by "Lee" or "Leonore" in the email system, but her email was ladraper@cps..). Please search from January 2012 through August of 2012.

- All emails from Grace Akinlemibola to Crystal Cooper from January 2012 through August of 2012.

- All emails from Grace Akinlemibola, where she requested for programs or grants to be moved to their new departments in the Oracle systems. Please search from February 2012 through August of 2012.

- All emails from Grace Akinlemibola, where Jennifer Cheatham was either cc'd or in the "To" field from July 1, 2012 through August 31, 2012.

- Include any replies on the same email chains from the last search.

- All emails from Ginger Ostro to Tim Cawley from July 2012 through October of 2012.

**Member of the Media:** No

**Preferred Method to Receive Record:** Electronic via FOIA Center

**Format:** PDF

---

**Message History**

On 3/1/2017 8:27:18 PM, gakinlem@gacbusiness.com wrote:

3/7/2017                                                   CPS

TO: "Chicago Public Schools FOIA Center"[cps@mycusthelp.net]
Hello Andrew,
The emails that I am requesting are not required to have a "category" to be delivered to me, especially where the emails do not produce a copious amount of results. For the second item ("emails from an email chain with Dana Brink, Aarti Dhupelia, and Ginger Ostro..."), please use the keyword "mayor."
As for the remaining emails, again, I do not need to provide a category, please understand that you will be held liable for conspiracy to commit fraud if I do not get what I need from you. Either way, I can get the emails now with your cooperation or later. Thanks!
Grace
On Mon, Feb 27, 2017 at 3:16 PM, Chicago Public Schools FOIA Center wrote:

On 2/27/2017 3:16:39 PM, Chicago Public Schools FOIA Center wrote:

02/27/2017

President Grace Akinlemibola
████████████, █████

Dear Grace:

RE:  Chicago Public Schools FOIA Request N002569-021517

Thank you again for using the Chicago Public Schools FOIA Center. We are writing regarding your Freedom of Information Act Request for the following records. Staff has reviewed your request and determined the following:

- *All emails sent from Grace Akinlemibola to Ginger Ostro from July 1, 2012 through August 31, 2012.*

**Response: As currently written, this item is categorical in nature as it seeks "all" emails from an individual to another individual over a two-month timeframe. Please narrow your request to manageable proportions by specifying a subject matter or keywords that can be used to perform an efficient search.-** *All emails from an email chain that began with an email from Grace Akinlemibola to Dana Brink and (maybe) Ginger Ostro, Dana Brink then added Aarti Dhupelia and Heather Wendell (if Ginger Ostro was not added in the original email, she would have been added by this reply email from Dana to Aarti where Dana forwarded Grace Akinlemibola's email), and the email chain would have ended with Aarti Dhupelia's response. Please search from January 2012 through August of 2012.*

**Response: As currently written, this portion of your request does not adequately identify a specific record. Please provide more information about possible subject matter or indicate keywords that could be used to perform an efficient search.-** *All emails from Grace Akinlemibola to Leonore "Lee" Draper (I forgot whether she went by "Lee" or "Leonore" in the email system, but her email was ladraper@cps..).* Please search from January 2012 through August of 2012.*

**Response: The FOIA office is unable to perform a search using these parameters and is advised that these individuals' email records were disposed of in accordance with the Board of Education's one-year email retention policy. Please see section 203.3 of the Chicago Public Schools Policy Manual and Board Report 07-0725-P03 adopted July 25, 2007.-** *All emails from Grace Akinlemibola to Crystal Cooper from January 2012 through August of 2012.*

**Response: The FOIA office is unable to perform a search using these parameters and is advised that these individuals' email records were disposed of in accordance with the Board of Education's one-year email retention policy. Please see section 203.3 of the Chicago Public Schools Policy Manual and Board Report 07-0725-P03, adopted July 25, 2007.-** *All emails from Grace Akinlemibola, where she requested for programs or grants to be moved to their new departments in the Oracle systems. Please search from February 2012 through August of 2012.*

**Response: The FOIA office is unable to perform a search using these parameters and is advised that this individual's email records were disposed of in accordance with the Board of Education's one-year e-mail retention policy. Please see section 203.3 of the Chicago Public Schools Policy Manual and Board Report 07-0725-P03 adopted July 25, 2007.-** *All emails from Grace Akinlemibola, where Jennifer Cheatham was either cc'd or in the "To" field from July 1, 2012 through August 31, 2012.*

- *Include any replies on the same email chains from the last search.*

**Response: As currently written, this item is categorical in nature as it seeks "all" emails from an individual to another individual over a two-month timeframe. Please narrow your request to manageable proportions by specifying a subject matter or keywords that can be used to perform an efficient search.-** *All emails from Ginger Ostro to Tim Cawley from July 2012 through October of 2012.*

**Response: As currently written, this item is categorical in nature as it seeks "all" emails from an individual to another individual over a two-month timeframe. Please narrow your request to manageable proportions by specifying a subject matter or keywords that can be used to perform an efficient search.**

Except for those items where the District's inability to perform a search is noted,  the remaining portions of your requests are unduly burdensome to the operations of the District as they could be expected to be comprised of thousands of pages. The staff time and resources to both process and legally review this volume of records would be immense and clearly burden the operations of the District.  In accordance with 5 ILCS 140/3 (g), the District asks that you narrow your request for information according to the guidance provided.

CPS

If you wish to narrow the unduly burdensome parts of your request, you must reply to this email. CPS will take no further action or send you any further correspondence unless and until your current request is narrowed. If we do not receive your narrowed request within five (5) calendar days of the date of this letter, the unduly burdensome parts of your current request will be considered denied.

Thank you for your interest in Chicago Public Schools.

Sincerely,

Andrew Mason
FOIA Officer
Chicago Public Schools

On 2/15/2017 5:39:00 AM, Chicago Public Schools FOIA Center wrote:

Dear Grace:

Thank you for your interest in Chicago Public Schools. Your FOIA request has been received and is being processed. Your FOIA Center reference number for tracking purposes is: N002569-021517

You have requested the following records: I would like the following emails: – All emails sent from Grace Akinlemibola to Ginger Ostro from July 1, 2012 through August 31, 2012. – All emails from an email chain that began with an email from Grace Akinlemibola to Dana Brink and (maybe) Ginger Ostro, Dana Brink then added Aarti Dhupelia and Heather Wendell (if Ginger Ostro was not added in the original email, she would have been added by this reply email from Dana to Aarti where Dana forwarded Grace Akinlemibola's email), and the email chain would have ended with Aarti Dhupelia's response. Please search from January 2012 through August of 2012. – All emails from Grace Akinlemibola to Leonore "Lee" Draper (I forgot whether she went by "Lee" or "Leonore" in the email system, but her email was ladraper@cps..). Please search from January 2012 through August of 2012. – All emails from Grace Akinlemibola to Crystal Cooper from January 2012 through August of 2012. – All emails from Grace Akinlemibola, where she requested for programs or grants to be moved to their new departments in the Oracle systems. Please search from February 2012 through August of 2012. – All emails from Grace Akinlemibola, where Jennifer Cheatham was either cc'd or in the "To" field from July 1, 2012 through August 31, 2012. – Include any replies on the same email chains from the last search. – All emails from Ginger Ostro to Tim Cawley from July 2012 through October of 2012.

Chicago Public Schools (CPS) responds to all public records requests in accordance with the Illinois Freedom of Information Act (FOIA), 5 ILCS 140/1 et seq.

Due to the high volume of FOIA requests received by CPS, we are unable to fulfill your request within 5 business days. Section 3(e)(vi) of FOIA permits CPS to extend the response time to 10 business days if a request cannot be fulfilled in 5 business days without unduly burdening or interfering with the operations of the District. We hereby extend the response time to your FOIA request to 10 business days in accordance with 5 ILCS 140/3(e)(vi).

If further time is needed to assemble and copy all documents responsive to your FOIA request, we will contact you with a time estimate and a request to extend.

Upon the completion of a response, CPS will provide the first 50 pages to you at no charge. If a response is more than 50 pages, a fee of 15¢ per page will be charged for each additional page. Copies of video recordings have a fee of $48. All applicable fees must be paid prior to the copying. CPS will inform you of any fees due if your paper response exceeds 50 pages.

You can monitor the progress of your request at the link below and you'll receive an email when your request has been completed. Thank you for using the CPS FOIA Center.

Track the issue status and respond at: https://mycusthelp.info/CPS/_cs/RequestEdit.aspx?rid=2569

On 2/15/2017 5:38:57 AM, President Grace Akinlemibola wrote:

Request was created by customer

CPS



# Exhibit

# E

# 4ᵗʰ Ward – William Burns

 

| | |
|---|---|
| | **Office:**<br>435 E 35ᵗʰ St<br>Chicago, IL 60616 |
| | **Committees:**<br>**Budget and Government Operations**<br>**Committees, Rules and Ethics**<br>**Chairman**-Education and Child Development<br>**Finance**<br>**Housing and Real Estate**<br>**Pedestrian and Traffic Safety**<br>**Transportation and Public Way**<br>**Workforce Development and Audit**<br><br>**Caucus:**<br>**Black Caucus**<br>**Paul Douglas Alliance** |

## Personal Background

- **Education:** University of Chicago, BA  University of Chicago, MA
- **Family:** ███████████
- **Professional:**
  - Former Senior Advisor to Emil Jones (IL Senate President)
  - Former Vice President of Program and Field Offices for the Chicago Urban League
  - Served as Education and Tax Policy Manger for Metropolitan Planning Council
  - Former Deputy Campaign Manager for Obama for Congress 2000

## Elections

Results:
- In February 2011, he was elected for the first time with 64.6% of the vote
- In February of 2015, he was reelected with 55.5% of the vote

Other Elected Positions: Elected to two terms as State Representative for the 26ᵗʰ District from 2008-2011

Supporters:
- United Food and Commercial Workers Local 881 (UFCW)
- SEIU Local 1
- Laborers District Council of Chicago
- Teamsters Joint Council 25
- SEIU Local 73
- Chicago Federation of Labor (CFL)
- Independent Voters of Illinois -- Independent Precinct Organization (IVI--IPO)
- Democrats for Education Reform (DFER)
- State Senator Kwame Raoul
- State Representative Barbara Flynn Currie
- State Representative Christian Mitchell
- Cook County Board President Toni Preckwinkle

Opponents:
- Previous election challengers: Tracey Y. Bey, Norman Bolden

**Budget/Revenues**

- 2007 Property Tax Vote- N/A
- 2007 Budget Vote – N/A
- 2014 Fee Increase Vote- Yes
- 2014 Budget Vote- Yes

Statements or editorials regarding budget and revenues: ·

**Q:** *Chicago's fire and police pensions are greatly underfunded, and the city is required by the state to make a $550 million payment into the pension funds by the end of 2015. Do you support restructuring the pension systems, inevitably reducing benefits, to put the funds on sound financial footing?* **A:** "First, the city must commit the revenue necessary to allow the systems to meet their obligations. Given recent court decisions, the city and the annuitants must come to an agreement regarding reduction of benefits for current and future pension fund participants." –Regarding options to restructuring pension fund system
-**The Chicago Sun-Times,** http://www.suntimescandidates.com/burns--will.html

"We have to have a flat income tax. So, at one level, it becomes a regressive tax…A better thing to do would be expand the sales tax [to] services on the state level and also have a Chicago pick-up on that. That makes a lot more sense than doing a [city] income tax."- Regarding a need to expand the sales tax instead of income tax
-**The Chicago Sun-Times,** http://chicago.suntimes.com/news/7/71/679303/hold-hold-hold-city-income-tax-table-one-alderman-says

"South Side Alderman Will Burns liked what he heard. "I appreciate the investments in afterschool programs, early childhood education, summer jobs, and obviously dedicating more resources to filling potholes," Burns said." –Regarding proposed 2015 budget
-**CBS News,** http://chicago.cbslocal.com/2014/10/15/mayor-emanuel-proposes-8-9-billion-city-budget/

**Ward Demographics**

- # TIF Districts and names
- # of City buildings
- % houses v. apartments
- Median income and income range